## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| YASIN ABDULKADIR, NOOR ABIYOW, ABDIKADIR GURE, ISMAEL ABDIRASHED MOHAMED, AWEYS MUHUDIN, | CASE NO. _____ |
| Plaintiffs, | Dated: February 27, 2019 |
| v. | Jury Trial Requested |
| DAVID HARDIN, Sheriff, Glades County; KEITH HENSON, Chief Deputy, Glades County; JOHN BOOHER SR., Chaplain, Glades County; MICHELLE SUMMERS, Food Service Administrator, Glades County; GLADES CORRECTIONAL DEVELOPMENT CORPORATION; GLADES COUNTY, FLORIDA, RONALD D. VITIELLO, Acting Director, U.S. Immigration and Customs Enforcement; JIM MARTIN, Field Office Director, Miami Field Office, U.S. Immigration and Customs Enforcement; JUAN ACOSTA, Assistant Field Office Director, Miami Field Office, U.S. Immigration and Customs Enforcement; JORGE L. DOMINGUEZ, Deportation Officer, U.S. Immigration and Customs Enforcement; JOSEPH J. BROWN, Deportation Officer, U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE
## RELIEF AND DAMAGES

## INTRODUCTION

1.     This is a religious free exercise case on behalf of five immigration detainees who have been denied the ability to freely practice their faith while in detention. Plaintiffs are Somali nationals who arrived in the United States years ago as refugees, fleeing violence and persecution in their native country. Each of the Plaintiffs is Muslim, and as such, they believe they must pray, fast, and observe other fundamental tenets of their Islamic faith.

2.     Each of the Plaintiffs was taken into custody by U.S. Immigration and Customs Enforcement ("ICE") and was placed on a failed deportation flight to Somalia in December 2017. During that flight, they were subjected to inhumane and degrading conditions—they were shackled for days without access to basic facilities such as restrooms, they sustained physical injuries, and they endured extreme emotional distress. *Ibrahim v. Acosta*, No. 1:17-CV-24574-DPG (S.D. Fla. filed Dec. 18, 2017); Jacey Fortin, *U.S. Put 92 Somalis on Deportation Flight, Then Brought Them Back*, N.Y. Times, Dec. 9, 2017, https://www.nytimes.com/2017/12/09/us/somalia-deportation-flight.html.   The   flight returned to the United States after two days, landing in Miami, Florida.

3.     But Plaintiffs' mistreatment did not end with the failed flight. The next day, they were sent to Glades County Detention Center ("GCDC"), where they have been subjected to multiple forms of abuse, including consistent gratuitous denials of their right to practice their religion.

4.      The Glades Defendants have, among other things, intentionally interfered with, delayed, and canceled prayer services; deprived Plaintiffs of religiously-compliant meals and instead provided them with food that is inedible, nutritionally deficient, or both; and failed to provide Plaintiffs with essential and commonplace religious articles that are necessary for their religious practice, including Qur'ans, prayer rugs, and head coverings. These actions by the Glades Defendants have never been based on any legitimate reason. Instead, they have been animated solely by a desire to harass and demean Plaintiffs and other Muslim detainees, simply because of their religious faith.

5.      In fact, when Plaintiffs and other Muslim detainees have requested relief and basic religious accommodation, they have nearly uniformly been rebuffed, and instead been informed: "This is Glades County!"

6.      This cruel behavior has not been limited to the Glades Defendants; the Federal Defendants have long been aware of the mistreatment Plaintiffs have endured. In the face of this knowledge, they have chosen to allow it to continue.

7.      Throughout 2018, Plaintiffs requested religious accommodation orally and through more than twenty written requests and grievances to various officials at GCDC and ICE.

8.      Despite these repeated requests, the long list of deprivations has continued. Plaintiffs waited more than a month and a half before finally obtaining Qur'ans, but usually not in their requested language. Officers have continued to interrupt and delay prayers or have stopped group prayer entirely. The facility admitted it does not provide halal (i.e. religiously permissible) meals and asserts that it does not need to do so, despite the fact

that another ICE facility in the area recognizes this common Muslim request and offers certified halal meals. During the Muslim holy month of Ramadan, a time of fasting and prayer, the meals offered to Plaintiffs continued to have non-halal products mixed in. Ramadan meals were frequently cold, inedible, or nutritionally suspect. GCDC also does not provide access to essential religious articles such as prayer rugs, beads, or head coverings, nor can these be purchased at the commissary.

9.    The existence of these unlawful obstacles to religious practice is publicly documented and well known to Defendants because of repeated detainee grievances, letters from advocacy groups, and media reports highlighting free exercise deprivations. Yet, in the face of this all, the Glades Defendants have failed to make any meaningful changes, and the Federal Defendants have not required them to change their practices.

10.    Under clearly established law, Defendants have denied Plaintiffs' fundamental constitutional rights guaranteed by the Free Exercise Clause of the First Amendment to the U.S. Constitution, as well as their statutory rights under the Religious Freedom Restoration Act ("RFRA"), the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Florida Religious Freedom Restoration Act ("FRFRA").

11.    Plaintiffs therefore request that this Court order Defendants to immediately provide conditions that will not unnecessarily hinder Plaintiffs' religious practice, including access to Qur'ans and religious articles, the ability to pray in groups, and a nutritionally adequate halal diet. Plaintiffs also seek compensatory and punitive damages, to remedy their injuries and prevent future abuses.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1346. Federal Defendants have waived sovereign immunity to this suit pursuant to 5 U.S.C.

§ 702. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and

2202, and injunctive relief under the All Writs Act, 28 U.S.C. § 1651. This Court has

supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (e).

## PARTIES

### I.     Plaintiffs

14.     Plaintiff Yasin Abdulkadir is a 47-year-old Somali man who came to the United

States as a refugee, fleeing civil war in his native country. He has been detained at GCDC

since approximately December 9, 2017, after the failed deportation flight. Mr. Abdulkadir

is Muslim. Consistent with his religious beliefs, he wishes to practice his faith while in

immigration detention. GCDC does not have a Muslim chaplain or volunteer, so Mr.

Abdulkadir serves as an informal religious leader for Muslim men at GCDC.

15.     Plaintiff Noor Abiyow is a 31-year-old Somali Muslim man who came to the

United States as a child refugee, fleeing civil war in his native country. He has been

detained at GCDC since approximately December 9, 2017, after the failed deportation

flight. Mr. Abiyow is Muslim. Consistent with his religious beliefs, he wishes to practice

his faith while in immigration detention.

16.   Plaintiff Abdikadir Gure is a 38-year-old Somali Muslim man who came to the United States as a refugee, fleeing civil war in his native country. He has been detained at GCDC since approximately December 9, 2017, after the failed deportation flight. Mr. Gure is Muslim. Consistent with his religious beliefs, he wishes to practice his faith while in immigration detention.

17.   Plaintiff Ismael Abdirashed Mohamed is a 26-year-old Somali Muslim man who came to the United States as a child refugee, fleeing civil war in his native country. He was detained at GCDC for about nine months beginning on or around December 9, 2017, after the failed deportation flight. Mr. Mohamed is Muslim. Consistent with his religious beliefs, he wished to practice his faith while in immigration detention. He was released from GCDC in September 2018 after prevailing in his immigration case.

18.   Plaintiff Aweys Muhudin is a 29-year-old Somali Muslim man who came to the United States as a child refugee, fleeing civil war in his native country. He has been detained at GCDC since approximately December 9, 2017, after the failed deportation flight. Mr. Muhudin is Muslim. Consistent with his religious beliefs, he wishes to practice his faith while in immigration detention.

## II.   Defendants

19.   Defendant David Hardin is the Glades County Sheriff. He is an independently elected county official paid from the county treasury and is the chief correctional officer in Glades County. He is responsible for managing county jails, including GCDC, which is

under his direct authority.[1] He is the immediate custodian of Plaintiffs detained at GCDC. He is named in his official capacity.

20.   Defendant Glades County Chief Deputy Keith Henson works at GCDC and is an employee at the detention facility with supervisory authority. The Chief Deputy is the "single administrator" of GCDC and all staff is responsible to him. Glades County Sheriff's Office Procedural General Order 700.01, at 1 (obtained through public records request) (on file with Plaintiffs' Counsel). He must "supervise, coordinate, and review all activities of the Detention Division." *Id.* Defendant Henson reviewed and denied or delayed numerous religious exercise complaints by Plaintiffs. He is named in his official and individual capacities.

21.   Defendant Glades County Chaplain John Booher Sr. works at GCDC and is responsible for conducting or supervising religious services and activities at the facility. Glades County Sheriff's Office Procedural General Order 730.04 (obtained through public records request) (on file with Plaintiffs' Counsel). The Chaplain is required to meet with the Chief Deputy and Food Services if he becomes aware that it is necessary to provide special meals to a detainee. *Id.* at 2-3. Defendant Booher reviewed and summarily denied numerous religious exercise requests by Plaintiffs and other similarly situated Muslims for Qur'ans, religious articles, and halal meals. He is named in his official and individual capacities.

---

[1] "The Glades County Detention Center is under the direct authority of Glades County Sheriff. The corrections operation is under the supervision of the Chief Deputy of Corrections and the correctional staff." *General Information*, Glades County Sheriff's Office, http://www.gladessheriff.org/?page=95824&pageid=5 (last visited Feb. 21, 2019).

22.   Defendant Michelle Summers is the Food Service Administrator ("FSA") at GCDC. The FSA is responsible for "planning, controlling, directing, and evaluating food service; training and developing the cook foremen; managing budget resources; establishing standards of sanitation, safety, and security; developing nutritionally adequate menus and evaluating detainee acceptance; developing specifications for the procurement of food, equipment, and supplies; and establishing a training program which ensures operational efficiency and a quality food service program." Glades County Sheriff's Office Procedural General Order 740.01, at 1 (obtained through public records request) (on file with Plaintiffs' Counsel). The FSA and the Chaplain develop ceremonial and religious meal schedules. *Id.* at 16-17. She is named in her individual and official capacities.

23.   Defendant Glades Correctional Development Corporation was incorporated as a nonprofit in 2002 for the express purpose of building GCDC. Its 501(c)(3) status was revoked by the Internal Revenue Service on February 15, 2017.[2] Glades Correctional Development Corporation was chartered by community leaders and elected officials, and the board is made up of local business owners, county officials, and a former Glades County Sheriff.[3] Glades Correctional Development Corporation owns GCDC.[4]

---

[2] *IRS Tax Exempt Organization Search, Glades Correctional Development Corporation EIN: 03-0479709*, IRS (July 6, 2018), https://apps.irs.gov/app/eos. By issuing tax exempt bonds in 2007, Glades Correctional Development Corporation allowed its investors to dodge income taxes on $23.5 million dollars over the course of a decade. The corporation converted its bonds to be taxable in 2017. Jacob Kang-Brown & Jack Norton, *More Than a Jail*, Vera Inst. of Justice, July 5, 2018, https://www.vera.org/in-our-backyards-stories/glades-county-more-than-a-jail.

[3] *See* Invoice from Robert DeMann, Chief Deputy, to DHS, ICE, Financial Operations-Burlington (Feb. 7, 2018) (obtained through public records request) (on file with Plaintiffs' Counsel).

[4] Kang-Brown & Norton, *supra* note 2.

8

24.   Defendant Glades County, Florida is listed as a contracting party in the Intergovernmental Service Agreement with DHS/ICE for detention services to be provided at GCDC. It is a non-charter county that adopted the county administrator form of government.[5]

25.   Defendant Ronald D. Vitiello is the Acting Director of ICE. The Acting Director of ICE has responsibility for and authority over the detention and removal of noncitizens throughout the United States, including over detention and removal operations at contract facilities. He is responsible for civil and criminal enforcement of federal laws governing border control, customs, trade, and immigration. He is named in his official capacity.

26.   Defendant Jim Martin is the Director of ICE's Miami Field Office. The Miami Field Office Director has responsibility for and authority over the detention and removal of noncitizens in Florida. He is responsible for ensuring that ICE officials follow the agency's policies and procedures in the district and for ensuring that ICE contractors conform with detention and contract standards. He is named in his official capacity.

27.   Defendant Juan Acosta is the Assistant Field Office Director of ICE's Miami Field Office. Mr. Acosta has responsibility for and authority over the detention center where Plaintiffs are detained. He is responsible for ensuring that ICE officials follow the agency's policies and procedures in the district and for ensuring that ICE contractors

---

[5] Aubrey Jewett, *County Government Structure in Florida*, Florida County Government Guide 7, 13 (2016), http://www.broward.org/Charter/Documents/Florida%20County%20Government%20Guide%20-%20County%20Government%20Structure%20in%20Florida.pdf.

conform with detention and contract standards. He is named in his individual and official capacities.

28.  Deportation Officer Jorge L. Dominguez is an ICE employee posted at GCDC. He is responsible for assisting in the detention and removal of noncitizens. He is named in his individual and official capacities.

29.  Deportation Officer Joseph J. Brown is an ICE employee posted at GCDC. He is responsible for assisting in the detention and removal of noncitizens. He is named in his individual and official capacities.

30.  Defendant ICE is a component agency of the U.S. Department of Homeland Security ("DHS"), which is a cabinet-level department of the United States federal government. ICE's responsibilities include enforcing federal immigration law within the interior of the United States, including by detaining and removing noncitizens from the United States.

## FACTUAL ALLEGATIONS

I.  **Plaintiffs Wish To Practice Their Faith While in Custody, but Defendants Place Unreasonable Burdens on Multiple Aspects of Their Religious Practice.**

31.  Despite repeated oral and written requests to practice their faith while detained at GCDC, Plaintiffs have encountered denials, delays, and arbitrary limitations on their ability to exercise their religion. ICE deportation officers, contract officers, and field officers knew about or observed these obstacles but failed to require the facility to change its practices.

a. *Failure To Take Minimum Steps To Protect Religious Practice Beginning at "In-Processing"*

32.    Glades Defendants have disregarded their obligations under federal law and contractual standards[6] to provide religious accommodations by failing to ask about the religious requirements of each detainee during in-processing.

33.    When Plaintiffs were initially booked into Glades, Glades employees did not ask them about their religious preference. As a result, Plaintiffs suffered grave deprivations of religious practice rights for the first weeks of detention, many of which are ongoing.

34.    About ten days after this booking, Glades employees reprocessed many of the Somali detainees. They again did not ask about their religious preference. At that point, some of the detainees tried to affirmatively raise their religious preference and insist that it be included in their file.

b. *Failure To Provide Plaintiffs with Essential Religious Items and Services*

35.    The Glades Defendants have taken a number of steps to deprive Plaintiffs and other Muslim detainees of items and services essential for their ability to practice their faith.

36.    The Holy Qur'an is the primary religious text of the Islamic faith, and its frequent recitation and study is of central importance to Muslims' religious practice.

---

[6] U.S. Immigr. and Customs Enf't, U.S. Dep't of Homeland Sec., *Religious Practices*, 2000 National Detention Standards 2 (Sept. 20, 2000), https://www.ice.gov/doclib/dro/detentionstandards/pdf/relpract.pdf ("In processing staff shall enter the detainee's religious designation into [the Deportable Alien Control System] at the detainee's initial in processing."). Facilities like GCDC must "meet or exceed" this standard. *Id.* at 1.

Adherents recite and study the Qur'an in Arabic and also seek to understand the meanings of its verses by reading interpretations of the text in a familiar language.

37.   Sunshine Law records disclosed by the Glades County Sheriff's Office show that Defendant Booher, who transferred to Glades County to serve as chaplain in approximately 2008, regularly denied Qur'an requests from Muslim detainees in the year prior to Plaintiffs' arrival. By the time Defendant Booher belatedly began to grant some detainee Qur'an requests, Plaintiffs had been at GCDC for about seven weeks.

38.   Even when it does provide copies of the Qur'an, GCDC generally provides them in English only. The facility does not provide copies in Arabic and also has not provided them in Plaintiffs' native languages. When Plaintiff Gure asked Defendant Booher why he would not provide the Qur'an in both Arabic and English, Defendant Booher stated, "It's like being pregnant; you either are or are not. You can't have it both ways." The detainee handbook, similarly, only allows for the possession of a single religious text.

39.   Plaintiffs' religious beliefs require them to pray five times a day in a ritually clean space, with a prayer rug or mat, and to cover their heads while praying (with a kufi). They also believe they should recite additional informal prayers throughout the day, and count their recitations using prayer beads.

40.   At GCDC, most of these materials are not available from the facility, the chaplain's office, or for purchase through the commissary. Because of a recent donation from a former detainee, Plaintiffs now have access to prayer rugs, but GCDC only allows the rugs to be used during Jumma prayer on Friday. Only individuals who arrived at GCDC

already in possession of kufis, rugs, or prayer beads have them now. As a result, Plaintiffs do not have the basic items they need to perform everyday religious obligations.

41.    In addition, men who came to the facility with kufis are prevented from wearing them. When Mr. Abdulkadir tries to pray with his head covered, GCDC officers yell at him and tell him that no head coverings are allowed. On one occasion, he was praying in his room with a towel draped over his head and an officer approached from behind and yanked it off.

42.    In the dorms, Muslim men without prayer rugs have to use bedsheets to pray on, because the GCDC staff will not allow them to use rugs outside of Jumma prayer in the multipurpose room. Some officers have given some Plaintiffs an extra sheet or blanket to use for prayer. However, the blankets have periodically been taken away and not immediately replaced, and Plaintiffs have been told that extras are unauthorized. Consequently, Plaintiffs frequently have to pray on the dirty concrete floor or use the same sheets for prayer and for bedding.

43.    GCDC has even denied Plaintiffs' requests for a free Islamic prayer schedule, which would be easy to print from the numerous websites providing such schedules. Plaintiffs had difficulty obtaining schedules with any consistency from December 2017 until the start of Ramadan in May 2018.

44.    Defendant Booher has also given preferential treatment to Christian detainees while ignoring the needs of Muslim detainees. He specifically sought out volunteers and assistance in setting up a Christian ministry at GCDC but did not do the same for Muslims.

45. For example, he asked two volunteers from Berean Ministries to provide Christian religious services to inmates and immigration detainees, including by providing Bibles and food. *Berean in the Sunshine State: A partnership made in Heaven and ordained by God* (Berean Prison Ministries), Jan. 2017, at 2-3, https://bereanprisonministries.org/wp-content/uploads/2015/03/January-2017-Berean-newsletter.pdf. Similar volunteer services that would provide either religious programming or access to religious texts such as Qur'ans and religious articles are available in Florida or from nationwide organizations. *See, e.g., Muslim Prisoners Support Project*, ICNA Council for Social Justice, http://icnacsj.org/mpsp (last visited Feb. 21, 2019) (providing facilities with donated Qur'ans and religious articles and assisting with location of religious volunteers on request); *Education*, Tayba Foundation, https://www.taybafoundation.org (last visited Feb. 21, 2019) (providing free distance learning program). Yet, Chaplain Booher made no attempt to provide Plaintiffs with such services.

46. When asked why Muslim practices are not allowed or are ignored, GCDC staff, including Chaplain Booher, have replied with statements like: "Boy, you're in Glades County."

47. Defendants have thus denied Plaintiffs access to essential religious articles and have needlessly and without any legitimate justification obstructed Plaintiffs' ability to exercise their faith.

*c.  Pattern of Needlessly Limiting Plaintiffs' Ability To Pray*

48.   A central tenet of Islam is the obligation for adult Muslims to pray—perform *salah*—five times each day. These prayers, which take place during specific parts of the day (dawn, early afternoon, late afternoon, post-sunset, and evening) are a basic aspect of the Islamic faith. Performing *salah* is one of the Five Pillars of Islam; for the vast majority of Muslims it is considered a foundation of their religious life and identity. Many Muslims also believe that it is vital to perform *salah* in a group setting if there are other Muslims in the vicinity during prayer times.

49.   The weekly congregational prayer for the Muslim community is on Friday afternoon, and is called Jumma. Jumma prayer, like daily prayer, should be performed on a rug, facing Mecca, after completing ritual ablutions. Jumma prayer differs from other daily prayers in that it is preceded by a religious speech by a member of the community. The group prayer after the speech is short. Muslims usually use a compass to find the direction of Mecca, and require a bathroom to perform their ablutions before prayer.

50.   The first two Fridays that Plaintiffs were detained at GCDC, GCDC staff prevented them from performing Jumma and they failed to provide any religious accommodation, even though other Muslim detainees requested Friday services prior to Plaintiffs' arrival.

51.   Although GCDC staff subsequently provided accommodations to allow Plaintiffs and other Muslim detainees to perform Jumma, they have taken a number of steps to needlessly impede their ability to pray. For example, on at least one occasion, GCDC staff cancelled Jumma without providing an alternative space for the prayer to be held.

Following a complaint by Mr. Abdulkadir, the facility designated an alternative area for Friday prayer. The designated area, however, is wholly inappropriate for prayer, given that it is caged, has deep sand on the ground, and is not ritually clean. Furthermore, there is no bathroom outside or any area nearby where the men can perform the necessary ablutions.

52.    Muslims must pray Jumma and other prayers facing Mecca, but the facility has not provided a compass and has even failed to provide the men with consistent information about the correct direction. Plaintiffs still have trouble discerning which direction is East. This disorientation is especially problematic when prayers are held in the multipurpose room, which is a windowless room accessed through a series of interior hallways, and when the adherents in attendance and officers monitoring could vary from week to week.

53.    Staff also frequently interrupt prayer or shout at detainees to hurry up. At the same time, guards bring the men to Friday prayer late, and once the men are in the multipurpose room they have no way to mark time, as there is no clock on the wall. Thus, even when Plaintiffs are able to pray on Fridays, it is often under conditions that significantly undermine their religious exercise.

54.    Glades Defendants have also unnecessarily limited the ability of Plaintiffs and other Muslim detainees to perform daily group prayer. When they were initially transferred to GCDC, Plaintiffs were permitted to congregate to complete daily prayers, an event that takes about ten minutes, in their dormitory rooms. The dormitory rooms are large enough to fit up to eight or nine devotees. However, more recently, GCDC staff have needlessly prevented Plaintiffs and other Muslim detainees from praying together in their dormitory rooms. GCDC staff have failed to provide any suitable alternative: while they have offered

to let Plaintiffs pray in the "day room", that space is frequently unavailable or inappropriate because of other activities such as games or television, or because the floor is wet or dirty.

   *d.   Failure To Provide Meals Compliant with Plaintiffs' Religious Beliefs*

   55.   Plaintiffs believe that eating a halal[7] diet, including halal meat, is a religious obligation.

   56.   Glades Defendants and ICE Deportation Officers Dominguez and Brown deny that Muslims actually believe in eating halal food. In a request response from April 2017, ICE Deportation Officer Brown wrote to a Muslim detainee, "Halal meals are not required by your religion." When a Plaintiff complained directly to ICE Deportation Officer Dominguez about the conditions at GCDC and in particular the lack of halal meals, Defendant replied, "if you want halal, go to Krome." Krome is an ICE-run detention facility in Miami. Of course, Plaintiffs cannot control or influence the facility at which they are detained. The *Ibrahim* class member Plaintiffs did ask to be transferred from GCDC to Krome for various reasons, including medical neglect, but ICE refused their requests. *Ibrahim v. Acosta*, No. 1:17-CV-24574-DPG (S.D. Fla. filed Dec. 18, 2017).

   57.   Similarly, Plaintiffs asked the GCDC kitchen and correctional staff for a halal diet. Plaintiffs submitted requests to Defendant Booher, the Chaplain, and Defendant Mills, the Food Service Administrator. Staff always responded that at GCDC they do not have halal meals but can only provide vegetarian meals.

---

[7] In Arabic, the word halal means "permitted" or "lawful." Halal foods are foods that are allowed under Islamic dietary guidelines for the purity and cleanliness of sources from which food is derived and for the processes by which food is made. *Halal Overview*, USA Halal Chamber of Commerce, Inc., http://www.ushalalcertification.com/halal-overview.html (last visited Feb. 21, 2019).

58.   In response to one request, Chaplain Booher responded, "[The] facility provides a diet that satisfies religious requirements. All you have to do is ask for a common fare meal." However, the vegetarian or "common fare" meal at GCDC does not satisfy the Plaintiffs' religious beliefs. Nor could there be a legitimate interest in denying Plaintiffs a nutritionally complete halal diet, when GCDC is designed specifically to house diverse immigration detainees and when ICE's Krome Detention Facility already provides certified halal meals at cost.

59.   Plaintiffs, all of whom wish to obtain halal meals, are still being denied access to the religious diet they sincerely believe they are required to eat.

60.   Every year, Muslims across the world observe the holy month of Ramadan, in part by abstaining from food and water between sunrise and sunset. Before dawn, they eat one meal (suhoor), and after sunset, they break their fast with another meal (iftar). As one of the five pillars of Islam, this practice of fasting is integral to the Islamic faith.[8] The food provided during Ramadan—like the food at other times—was not halal, and also posed additional challenges for the men.

61.   ICE regulations require double-portioning Ramadan meals, which are served before and after sunset. Email from ERO Taskings on behalf of Tae D. Johnson, Assistant Director for Custody Management, with the concurrence of Nathalie R. Asher, Assistant Director for Field Operations to Field Office Directors, Deputy Field Office Directors, and

---

[8] For more information on Ramadan, fasting, and Islam generally, *see* Arab American Nat'l Museum, *Islam and Muslim Americans*, AANM Educational Series (2010), http://www.arabamerican museum.org/umages/pdfs/resource_booklets/AANM-IslamBooklet-v6.pdf.

Assistant Field Office Directors (Apr. 10, 2018, 3:36 PM EDT) (obtained through public records request) (on file with Plaintiffs' Counsel). However, on several occasions the meals were not in fact double-portioned, leaving Plaintiffs hungry.

62.   During Ramadan at GCDC, food for breaking the fast in the evening was often inedible and posed safety concerns. Usually meals came on trays stacked in a cart, and only the plates on the bottom of the stack were warm. The other plates went cold after sitting out over the course of the day.[9] Sometimes, it appeared that the food served was not from earlier that day, since it didn't match the earlier menu. On one occasion, towards the end of Ramadan, the men could not bring themselves to eat the food provided despite having fasted all day because there appeared to be a meat product they could not identify on their plates and it smelled rotten.

63.   Previous inspections of GCDC have revealed that detainees are served the same pasta meal on average six times per week, yet ICE still rated the facility's meals as being "nutritious and appetizing." G-324A ICE Detention Standards Review Worksheet, Annual Review for GCDC 26 (May 18, 2017) (obtained through public records request) (on file with Plaintiffs' Counsel). During Ramadan, it appears that during an average week,

---

[9] This practice raises serious safety concerns, in addition to inhibiting Plaintiffs' ability to practice their religion. According to the U.S. Department of Agriculture, meat can only sit out for two hours above 40 degrees Fahrenheit before safety becomes an issue. *"Danger Zone" (40 °F - 140 °F)*, Food Safety and Inspection Serv., U.S. Dep't of Agric., https://www.fsis.usda.gov/wps/portal/fsis/topics/food-safety-education/get-answers/food-safety-fact-sheets/safe-food-handling/danger-zone-40-f-140-f/CT_Index. According to the Centers for Disease Control and Prevention, thirty-seven percent of outbreaks with a known contributing factor began simply because food was left out at room temperature for longer than is safe—the most common cause identified. Mariel A. Marlow et al., *Foodborne Disease Outbreaks in Correctional Institutions—United States 1998-2014*, 107 Am. J. Pub. Health 1150 (2017).

detainees were served twelve pasta meals while fasting. The pasta meals appeared to Plaintiffs to consist of meat product of unknown origin intermingled with tomato sauce.

64.    As a result of both safety and religious concerns, the men participating in the fast were forced to try to cobble together meals with commissary food when they could. At other times, they simply had to eat less when there were no other options. Ultimately, many of them had to eat food that violates their religious beliefs, because they felt they had no other choice. Defendants thus deprived Plaintiffs of a nutritionally adequate diet that accommodates their religious beliefs during the month of Ramadan.

**II.     GCDC Repeatedly Fails To Comply with Detention Standards Pertaining to Religious Exercise, and ICE Fails To Monitor or Enforce Contract Standards Despite GCDC's Pattern of Violations.**

65.    Federal Defendants, in addition to participating in the previously-described violations, have failed to monitor or enforce religious exercise contractual standards. Despite actual knowledge of religious liberty deprivations, they have failed to stop ongoing rights violations or to prevent future violations from occurring at GCDC.

*a.   GCDC Is Governed by Contractually-Incorporated Detention Standards that Fall Below the Statutory Floor for Free Exercise Protection.*

66.    GCDC is governed by the least rigorous ICE contract standards, the 2000 National Detention Standards ("NDS").[10] Additionally, RFRA, RLUIPA, and constitutional free exercise protections apply to immigration detainees.

---

[10] *See* Intergovernmental Service Agreement Between ICE and Glades County 4 (May 30, 2007) (stating that inspectors will check for compliance against the 2000 standards), https://www.document cloud.org/documents/1658083-glades-county-fl-igsa-contract.html.

*b.   GCDC Is a Persistent Violator of the Detention Standards.*

67.   Over the past several years, numerous complaints and instances of free exercise deprivations and other violations have been made known to the Sheriff of Glades County and to ICE, but ICE has continued to give the facility positive ratings and has continued to send immigration detainees to GCDC.

68.   Federal Defendants Dominguez and Brown are personally responsible for reporting and enforcement of contract facility standards. Defendants Dominguez and Brown were also personally involved in ignoring detainee halal diet requests. Plaintiffs requested halal diets orally and in writing, but were ignored or dismissed.

69.   A 2016 letter documented complaints from Muslim detainees about GCDC's failure to provide a religiously acceptable diet.[11] A 2012 letter documented complaints about lack of private attorney calls, lack of affordable access to phones, lack of medical care, and inappropriate use of segregation, among other issues.[12] There have been numerous other letters[13] setting forth similar abuses, as well as civil litigation challenging

---

[11] Letter from Jessica Zagier Wallace of the Southern Poverty Law Center and Romy Lerner of the Immigration Clinic of the University of Miami School of Law to Major Keith Henson of the Glades County Sheriff's Department and Supervisory Detention and Deportation Officer David Waite of the ICE Miami Field Office (Jan. 19, 2016), https://media.law.miami.edu/clinics/pdf/immigration-letter-jan19.pdf.

[12] Letter from Alexandra Friz, et al. of the Immigration Clinic of the University of Miami School of Law to Field Office Director Marc Moore and Assistant Field Office Director Paul Candemeres of the ICE Miami Field Office (Oct. 8, 2012), https://media.law.miami.edu/clinics/pdf/2012/letter-to-ice-100812.pdf.

[13] *See* OIG Complaint and Request for Investigation filed by the Legal Aid Service of Broward County, Inc., the Immigration Clinic of the University of Miami School of Law, and Americans for Immigrant Justice, Exs. A-E, at 18-45 (Jan. 18 2018) (attaching: Letter from Rebecca Sharpless and Romy Lerner of the Immigration Clinic of the University of Miami School of Law and Lauren Gilbert of the St. Thomas University School of Law to Marc Moore, Field Office Director, ICE (May 30, 2017) (documenting complaints of abuse, lack of medical attention, and lack of attorney access, among others); Letter from Cyndi Poon, et al. of the Immigration Clinic of the University of Miami School of Law to Marc Moore,

detention conditions at the facility.[14] Despite these widespread reports of abuse and malfeasance at GCDC, ICE has regularly rated the facility as "acceptable" in its last seven annual reviews.[15]

70.   Upon information and belief, Defendant Martin, ICE Miami Field Office Director, and Defendant Acosta, Assistant Field Office Director, were personally involved in the decision to detain Plaintiffs at GCDC after they landed in Miami. *See* U.S. Immigr. and Customs Enf't, U.S. Dep't of Homeland Sec., Performance-Based National Detention Standards   2011   §   7.4   Detainee   Transfers,   at   457   (revised   2016), https://www.ice.gov/doclib/detention-standards/2011/7-4.pdf (decisions about detainee transfers are made by the Field Office Director or designee). Defendants Martin and Acosta

---

Field Office Director of the ICE Miami Field Office, Ramon Bado, Assistant Field Office Director of the ICE Miami Field Office, ICE Officer Antonio Nieves, and Major Keith Henson (Nov. 1, 2013) (documenting complaints of insufficient access to legal representatives, overcrowding, abusive treatment, inappropriate use of segregation and exorbitant telephone fees, among others); Letter from Saul Cardenas, et al. of the Immigration Clinic of the University of Miami School of Law and Romy Lerner of Americans for Immigrant Justice to Marc Moore, Field Office Director of the ICE Miami Field Office, Paul Candemeres, Assistant Field Office Director of the ICE Miami Field Office, Anthony Aiello, Assistant Field Office Director of the ICE Miami Field Office, Michael Hornett, Supervising Detention and Deportation Officer at Glades Detention Center, and Laura Bedard, Warden of Glades Detention Center (Oct. 7, 2011) (documenting complaints of lack of access to private attorney calls, overcrowding, and water quality, among others)), https://media.law.miami.edu/clinics/pdf/2018/OIG-complaint-against-glades.pdf.

[14] *Belleri v. United States*, No. 10-81527-CIV, 2012 WL 12892399, at *2 (S.D. Fla. Jan. 17, 2012), *vacated*, 712 F.3d 543 (11th Cir. 2013) (noting plaintiff's allegations that he had inadequate food and was pepper-sprayed and restrained for complaining, and was placed in solitary confinement after hunger striking to protest the lack of sufficient food. Also noting medication shortages and lack of access to psychiatrist).

[15] *ICE Detention Facilities as of November 2017*, NIJC (2018), http://immigrantjustice.org/ice-detention-facilities-november-2017 (data may be downloaded and viewed in Excel) (Noting that the last inspection rating was on 5/18/2017. The facility was rated "superior" just once, in 2010).

also knew or should have known that Plaintiffs are Muslim and that GCDC did not provide halal meals and failed to provide religious accommodation.

71.   In June 2018, during the final week of Ramadan, undersigned counsel for plaintiffs wrote a public letter detailing GCDC's failure to provide Plaintiffs the most basic accommodations for their religious practices. Many of the non-Ramadan specific problems noted by counsel then still persist at this time.[16]

72.   After counsel sent the letter, Defendant Acosta wrote to Defendant Henson asking about the truth of the allegations in the letter. Defendant Henson replied, "To my knowledge there have been no requests or grievances from any members of the population addressing any of the outlandishly inaccurate accusations in this letter." Email from Keith Henson, GCDC, to Juan Acosta, ICE (June 7, 2018, 10:58 AM EDT) (obtained through public records request) (on file with Plaintiffs' Counsel).

73.   Yet at the time that email was sent, there had been no fewer than fifteen requests or grievances from Plaintiffs alone on the subject of prayer, religious texts and accessories, and halal meals, and several similar complaints from Muslim detainees that predated Plaintiffs' arrival to GCDC.

74.   Defendant Henson also wrote to Defendant Acosta that there is no halal food at Glades. Defendant Henson wrote, "The facility food, specifically meat products, are not

---

[16] More than a month after Counsel sent a letter to Defendants Hardin and Acosta, an ICE official, David Gonzales, contacted counsel asking for the names and alien numbers of the detainees who were the source of the complaints. Mr. Gonzales stated in a telephone call that the detainees would be interviewed. Counsel declined to pass on the names and alien numbers of detainees without a guarantee of confidentiality and the opportunity for counsel to be informed in advance of and be present at any interviews that might occur. ICE appears to have taken no further action since that time.

prepared and/or obtained in accordance with the halal food laws outlined in the Qur'an . .

." Email from Keith Henson, GCDC, to Juan Acosta, Jorge Dominguez, Joseph Brown, and Steven Oliver, ICE (June 8, 2018, 4:53 PM EDT) (obtained through public records request) (on file with Plaintiffs' Counsel). Defendant Henson then went on to explain why he believes the common fare diet is a substitute. Yet numerous Muslim detainees have complained about the lack of halal food, have requested and been refused Kosher diets by the chaplain and food services, and have found the common fare option to be unacceptable.

75.    DHS's Office of the Inspector General has confirmed that ICE officials do not adequately enforce federal law and contract detention standards nationwide. *See generally*, Office of the Inspector Gen., U.S. Dep't of Homeland Sec., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*, OIG-18-67 (June 26, 2018) (". . . ICE's inspections, follow-up processes, and onsite monitoring . . . do not ensure adequate oversight or systemic improvements in detention conditions, with some deficiencies remaining unaddressed for years.")

76.    Thus, despite knowledge of free exercise violations and problems at GCDC, Federal Defendants failed to correct the repeated violations, and knew or should have known they would occur or were ongoing but failed to act.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (Violation of RFRA)
#### (Against Defendants Vitiello, Martin, Acosta, Dominguez, Brown, and ICE)

77.    All the foregoing allegations are repeated and incorporated as though fully set forth herein.

78.   RFRA was enacted "to provide a claim or defense to persons whose religious exercise is substantially burdened by government" and guarantees that interests like Plaintiffs' in religious freedom will be protected using the strictest standard of review. 42 U.S.C. § 2000bb(b).

79.   Under RFRA, Plaintiffs are protected from substantial burdens on their religious practice, if those burdens are not narrowly tailored to achieve a compelling government interest. Defendants implemented federal immigration law in a way that seriously hindered Plaintiffs from practicing their faith for the period of their detention.

80.   In particular, Federal Defendants decided to confine Muslim Plaintiffs at GCDC, a facility known to deny detainees access to halal meals and to violate numerous ICE detention standards. By choosing to hold Plaintiffs at a facility known for its abuses, where Defendants knew or should have known that Muslims very likely would be denied minimal religious accommodations, and by choosing each day to continue holding them at this facility, Defendants substantially burden Plaintiffs' free exercise of religion, in violation of RFRA.

81.   In dismissing Plaintiffs' concerns, failing to take remedial measures or to address the problem with GCDC staff, and failing to assist Plaintiffs or advise them about their rights, Defendants Dominguez and Brown have substantially burdened Plaintiffs' free exercise of religion, in violation of RFRA.

82.   Grievances that are addressed to ICE officials must be logged and forwarded by the GCDC grievance officer to the ICE facility supervisor for action. Glades County Sheriff's Office Procedural General Order 790.03, at 4 (obtained through public records

25

request) (on file with Plaintiffs' Counsel). Thus, ICE supervisors and staff assigned to GCDC knew or should have known of the numerous free exercise issues at the facility.

83.   Federal Defendants also failed to ensure GCDC compliance with contractual standards on religious free exercise. Plaintiffs filed numerous grievances and complaints to GCDC officials that are logged and open for ICE inspection to ensure compliance with free exercise standards. ICE officials failed to enforce even the minimal free exercise contract standards that did exist, despite actual knowledge of violations of those standards.

84.   Defendant ICE officials also failed to ensure that GCDC complied with applicable federal laws relating to free exercise, beyond the 2000 Detention Standards.

85.   Defendants therefore failed to enforce federal law and the GCDC detention contract and failed to protect detainees they should reasonably have known to be suffering from free exercise deprivations.

86.   Alone or in combination, Defendants have burdened Plaintiffs' free exercise rights, by failing to enforce the detention standards, take remedial action, or ensure that GCDC is complying with its obligations under federal law.

### SECOND CLAIM FOR RELIEF
#### (Violation of RLUIPA)
**(Against Defendants Glades Correctional Development Corporation, Glades County, Hardin, Henson, Booher, and Summers)**

87.   All the foregoing allegations are repeated and incorporated as though fully set forth herein.

88.   Under RLUIPA, no "government" shall impose a substantial burden on the religious exercise of a person "residing or confined to an institution, as defined in section 1997." 42 U.S.C. § 2000cc-1(a). The rule applies even to burdens that "result[] from a rule

of general applicability." *Id.* To overcome the rule against burdening religious practice, the government must show that imposition of the burden on that person "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.*

89.   Plaintiffs sincerely believe they must read the Qur'an in Arabic and study it in a familiar translation; pray five times a day in groups when that is possible; congregate for Jumma prayer on Friday afternoon; eat halal food during Ramadan and at all other times of the year; and use religious articles in their daily worship.

90.   Defendants have a pattern of delaying the delivery of Qur'ans, denying access to the Qur'an in languages other than English, obstructing group and Friday prayer, providing cold or rotten food to detainees who are fasting, denying halal food, and not providing religious articles that are important for worship. Each of these practices burdens Plaintiffs' religious exercise, in violation of RLUIPA.

91.   Defendants' disregard for the religious practice of detainees is apparent in the fact that they do not ask whether individuals have a religious preference when they first arrive at GCDC, despite the requirement in Defendants' own detention standards mandating proactive accommodation. Defendants have no compelling, let alone narrowly tailored, interest in these restrictions on Plaintiffs' free exercise rights.

92.   Defendants' obstructions of religious free exercise—alone or in combination—violate the RLUIPA.

93.   As a result, Defendants have restricted Plaintiffs' religious practices without reason, and Plaintiffs have been adversely affected and aggrieved by Defendants.

## THIRD CLAIM FOR RELIEF
## (Violation of FRFRA)
### (Against Defendants Glades Correctional Development Corporation, Glades County, Hardin, Henson, Booher, and Summers)

94.   All the foregoing allegations are repeated and incorporated as though fully set forth herein.

95.   FRFRA, Fla. Stat. §§ 761.01-.05, states that the government shall not substantially burden religious exercise, unless it can demonstrate that the burden is in furtherance of a compelling government interest and is the least restrictive means of achieving that interest. Fla. Stat. § 761.03.

96.   The scope of protection under FRFRA is broader than that afforded by the decisions of the United States Supreme Court. *Warner v. City of Boca Raton*, 887 So. 2d 1023, 1032 (Fla. 2004) ("under the FRFRA the definition of protected 'exercise of religion' subject to the compelling state interest test includes any act or refusal to act *whether or not compelled by or central to a system of religious belief.*").

97.   Plaintiffs sincerely believe they must read the Qur'an in Arabic and study it in a familiar translation; pray five times a day in groups when that is possible; congregate for Friday speech and prayer on Friday afternoon; eat halal food during Ramadan and at all other times of the year; and use religious articles in their daily worship.

98.   Defendants have a pattern of delaying the delivery of Qur'ans, denying access to the Qur'an in languages other than English, obstructing group and Friday prayer, providing cold or rotten food to detainees who were fasting, denying halal food, and not providing religious articles that are important for worship. Each of these practices burdens Plaintiffs' religious exercise, in violation of FRFRA.

99.   Defendants' disregard for the religious practice of detainees is apparent in the fact that they do not ask whether individuals have a religious preference when they first arrive at GCDC, despite the requirement in Defendants' own detention standards mandating accommodation. As a result, Defendants have no compelling, let alone narrowly tailored, interest in these restrictions on Plaintiffs' free exercise rights.

100.   Defendants' obstructions of religious free exercise alone or in combination violate the FRFRA.

101.   As a result, Defendants have restricted Plaintiffs' religious practices without reason, and Plaintiffs have been adversely affected and aggrieved by Defendants.

**FOURTH CLAIM FOR RELIEF**
**(Violation of the First and Fourteenth Amendments)**
**(Against Defendants Glades Correctional Development Corporation, Glades County, Hardin, Henson, Booher, and Summers)**

102.   All the foregoing allegations are repeated and incorporated as though fully set forth herein.

103.   Under the First Amendment religion clauses, Congress shall make "no law respecting an establishment of religion" or "prohibiting free exercise thereof." U.S. Const. Amend. I. Prisoners retain First Amendment protections, *Cruz v. Beto*, 405 U.S. 319, 321 (1972). Prison regulations that impinge on those rights must be set aside unless they are "reasonably related to legitimate penological interests," i.e. related to punishment or crime and prison management. *Turner v. Safley*, 482 U.S. 78, 89 (1987).[17]

---

[17] Punishment is never a legitimate penological interest in civil detention, *Bell v. Wolfish*, 441 U.S. 520, 538 (1979), which includes immigration detention, *Al-Shahin v. DHS*, 2007 U.S. Dist. LEXIS 75018, at *34 (D.N.J. Oct. 3, 2007).

104. Plaintiffs sincerely believe they must read the Qur'an in Arabic and study it in a familiar translation; pray five times a day in groups when that is possible; congregate for Friday speech and prayer on Friday afternoon; eat halal food during Ramadan and at all other times of the year; and use religious articles in their daily worship.

105. Defendants have a pattern of delaying the delivery of Qur'ans, denying access to the Qur'an in languages other than English, obstructing group and Friday prayer, providing cold or rotten food to detainees who were fasting, denying halal food, and not providing religious articles that are important for worship. Each of these practices burdens Plaintiffs' religious exercise, in violation of the First Amendment.

106. Defendants' disregard for the religious practice of detainees is apparent in the fact that they do not ask whether individuals have a religious preference when they first arrive at GCDC, despite the requirement in ICE detention standards mandating accommodation. As a result, Defendants' restrictions are arbitrary, and not reasonably related to a legitimate government interest.

107. Defendants' obstructions of religious free exercise alone or in combination violate the First Amendment.

## DEMAND FOR JURY TRIAL

108. Plaintiffs hereby demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court grant them the following relief:

   a) Declare that the acts, omissions, polices, and practices of Defendants, and their agents, employees, and officials, described herein, are in violation of the rights

of Plaintiffs under RFRA, RLUIPA, FRFRA, and the First Amendment to the U.S. Constitution;

b) Enjoin Defendants from the illegal and unconstitutional conditions, acts, omissions, policies, and practices set out above;

c) Order Defendants and their agents, employees, and officials to accommodate the religious practices of Plaintiffs. Defendants' plan shall include at a minimum:

    i. Providing halal, nutritionally adequate meals to detainees who request a halal diet, without delay or the need for repeated and renewed requests;

    ii. Providing access to religious items and Qur'ans in Arabic and a second language of choice to detainees who request them, and permitting detainees to use these items throughout the facility; and

    iii. Permitting daily group prayer throughout the day;

d) Order Federal Defendants to amend all detention standards to require full compliance with federal law, including RFRA and RLUIPA;

e) Award Plaintiffs damages for the deprivation of rights they suffered;

f) Award Plaintiffs costs of this suit and reasonable attorneys' fees and litigation expenses pursuant to RFRA, FRFRA, the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable provisions;

g) Retain jurisdiction of this case until Defendants have fully complied with orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

h) Award such other and further relief as the Court deems just as proper.

Dated:       February 27, 2019                          Respectfully submitted,

_/s/Joseph Saei_
Sirine Shebaya *
Joseph Saei*†
Muslim Advocates
P.O. Box 34440
Washington, D.C. 20043
Tel: (202) 873-2622
sirine@muslimadvocates.org
yusuf@muslimadvocates.org

_/s/_

Lisa Lehner
FL Bar No. 382191
Americans for Immigrant Justice
6355 N.W. 36th St.
Suite 2201
Miami, FL 33166
Tel: (305) 576-1106
llehner@aijustice.org

_Attorneys for Plaintiffs_

_* Pro hac vice applications forthcoming_
_† Admitted to practice in California,_
_supervised by members of the DC bar_